United States District Court
Northern District of California

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| VIA TECHNOLOGIES, INC. (A CALIFORNIA CORPORATION), ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> ASUS COMPUTER INTERNATIONAL, et al., <br><br> Defendants. | Case No.  14-cv-03586-BLF <br><br> **ORDER GRANTING IN PART AND DENYING IN PART SUMMARY JUDGMENT MOTIONS** <br><br> [Re:  ECF 216, 219] |

Plaintiffs VIA Technologies, Inc., a California corporation, VIA Technologies, Inc., a Taiwan corporation, and VIA Labs, Inc., (collectively, "VIA") bring this action alleging patent infringement and trade secret misappropriation against Defendants ASUS Computer International, ASUSTeK Computer Inc. ("ACI"), and ASMedia Technology Inc. ("ASM") (collectively, "ASUS").  In the patent portion of the lawsuit, VIA alleges that ASUS infringes VIA's U.S. Patent No. 7,313,187 (the "'187 patent") and U.S. Patent No. 8,476,747 (the "'747 patent").

Before the Court are VIA's motion for partial summary judgment and ASUS' motion for partial summary judgment.  The Court, having considered the briefing submitted by the parties and the oral argument presented at the hearing on April 6, 2017, GRANTS IN PART and DENIES IN PART VIA's motion and ASUS' motion for the reasons stated below.

## I.   BACKGROUND

The following facts are taken from VIA's Third Amended Complaint and are provided solely as background.  They are not to be taken as undisputed.

VIA manufactures products with USB 3.0 controller chip technology, "to implement the USB 3.0 high-speed serial transfer protocol."  Third Am. Coml. ("TAC") ¶ 25.  The trade secret components of VIA's USB 3.0 technology have not been publicly disclosed.  *E.g.*, *id.* ¶¶ 34-35.

VIA alleges that it initially suspected that ASM misappropriated its trade secrets relating to this technology when VIA became aware of a "rapid increase in ASM's revenue derived from USB 3.0 related sales." *Id.* ¶ 42. VIA alleges that, as a result of ASM's "mass raiding" of VIA's former employees, ASM had knowledge of VIA's trade secret information related to VIA's USB 3.0 technology. *Id.* ¶ 40.

VIA brings suit against all three ASUS-related entities, alleging infringement of the '187 and the '747 patents, as well as trade secret misappropriation under 18 U.S.C. §§ 1836 *et seq.* and California Civil Code §§ 3426 *et seq.*  *E.g.*, *id.* ¶¶ 61, 71, 81, 97.

## II.  UNDISPUTED FACTS AND THE PARTIES' VERSIONS OF FACTS RELEVANT TO THE MOTIONS

VIA accuses ASUS' ASM 1351, ASM 1153, and ASM 1053 chips of infringing claims 1, 7, 12, and 15 of the '747 patent.  The asserted claims are directed to leadframes and leadframe type packages.  *E.g.*, '747 patent at 6:7-24.  VIA Mot. 2, ECF 216.  According to VIA, the opinion of its expert, Mr. Miguel Gomez, establishes that the accused products infringe each of the asserted claims.  *Id.* at 2, 8; Gomez Infringement Rpt. ¶¶ 142-230, ECF 216-2.  ASUS disputes that VIA has sufficiently met its burden as a moving party.

As for ASUS' motion that VIA's trade secret claims are time-barred, ASUS asserts the following facts in support of its motion.  ASUS Mot. 16.  ASM published multiple public press releases and contributed to several news articles regarding its development of USB 3.0 devices throughout 2009 and 2010.  *Id.* at 17; Exhibits S-Z to Lemieux Decl.  ASM filed a U.S. Patent application that was later published on March 25, 2010, involving a phase locked loop module. *Id.* at 18; Ex. 8 to Bhakar Decl. ("Wu Publ."), ECF 219-9.   VIA disputes any of these facts demonstrate that it should have been on notice of its trade secret claims earlier than 2011.

Additional relevant facts to the parties' motions pertain to the validity of the '747 patent and certain prior art references.  They are separately discussed below.

## III.  EVIDENTIARY ISSUES AND OBJECTIONS

### A.  Evidentiary Objections

VIA objects to Dr. Baker's declaration submitted with the Reply in support of ASUS'

motion, because the declaration contains new expert opinions that should have been included with ASUS' opening motion. Objection to Baker Decl., ECF 245. VIA claims that Dr. Baker opined on whether a patent application, Publ. No. US 2010/007724 ("Wu Publ."), contains VIA's trade secrets. *Id.* at 2. VIA further argues that the opinions in this declaration are improper because they were not included in Dr. Baker's rebuttal report. *Id.* at 3. Because these opinion were provided for the first time in a declaration on a summary judgment motion and should have been included in Dr. Baker's expert reports, the Court SUSTAINS the objection and will not consider this declaration. *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) (holding that Rule 37(c)(1) forbids "the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed"); *Roe v. Doe*, No. 09-0682-PJH, 2009 WL 1883752, at *5 (N.D. Cal. June 30, 2009) (noting that "[i]t is well accepted that raising of new issues and submission of new facts in [a] reply brief is improper") (citation omitted).

ASUS objects to exhibits submitted with the Reply in support of VIA's motion for summary judgment of infringement. Objection to Reply Evid., ECF 246. Specifically, ASUS objects to the excerpts of ASUS' interrogatory responses, excerpts of James E. Pampinella's expert rebuttal report served on January 27, 2017, and excerpts of Eric Welch's expert rebuttal report. *Id.* at 4. ASUS argues that these exhibits should have been provided in support of a prima facie showing of infringement in VIA's opening motion. *Id.* at 4. Because the interrogatory responses are drafted by ASUS and the expert reports are from ASUS' own experts, the Court finds that ASUS clearly was on notice of the contents of these exhibits. Further, these exhibits were proffered by VIA to support infringement of claims 1, 7, 12, and 15 of the '747 patent by ASUS, which ASUS represented at the hearing that it would not contest. Accordingly, the Court OVERRULES ASUS' objection.

### B.     Requests for Judicial Notice

ASUS requests judicial notice of the following documents (1) documents filed by VIA in the parallel Taiwanese Court Proceedings, Exs. A-E to Am. Wang Decl., ECF 230-1 to 230-5; and (2) Certified Translations of Exhibits A to E to the Wang Declaration, Exs. F-J to Zhang Decl., ECF 219-18 to 219-22, which include published articles that appeared in the periodical Digitimes

United States District Court
Northern District of California

United States District Court
Northern District of California

on October 22, 2009, and November 5, 2010, that were attached by VIA to its Supplemental Criminal Complaint in Taiwan, Exs. H-J to Zhang Decl., ECF 219-20 to 219-22; (3) public press releases made by ASM during the relevant time period prior to 2011, posted on ASM's public website, created and maintained in the ordinary course of business by ASM, and produced in discovery by ASM as ASM business records, Exs. S-Z to the Lemieux Decl., ECF 219-32 to 219-39; (4) VIA's original complaint filed in this action on August 7, 2014; and (5) the Wu Publication.  ASUS Mot. 17 n.1, 18 n.2-3.

With respect to the documents filed in the Taiwanese Court Proceedings and the published articles attached thereto, they are accompanied by a certified translation and an attestation from a translator, Jian Zhang, that the documents are true and correct copies of the documents.  Exs. F-J to Zhang Decl.  Accordingly, the Court takes judicial notice of these documents but does not accept them for the truth of the matters asserted therein.  *E.g.*, *Luxpro Corp. v. Apple Inc.*, No. 10-03058-JSW, 2011 WL 1086027, at *3 (N.D. Cal. Mar. 24, 2011) (taking judicial notice of Taiwanese and German court orders where "the foreign court orders were submitted by translators who certified under penalty of perjury that they translated true and correct copies of the orders and that they have provided true and correct copies of their translations").

VIA does not object to this Court taking judicial notice of filings in the Taiwanese Court Proceedings, the certified translations and the articles attached to the filings.  However, it objects to Exhibits Q, S-Z to Lemieux Declaration, which include ASM's public presentation and press releases.  ASUS Opp'n 13; Exs. Q, S-Z to Lemieux Decl.

As for Exhibit Q to Lemieux Declaration, ASUS provides this exhibit as a presentation given by an ASM employee, Weber Chuang, at a conference in March 2010.  This exhibit does not appear to be a press release and Weber Chuang did not make a declaration attesting to its authenticity.  This presentation is not incorporated by VIA's complaint and the other exhibits proffered by ASUS only show that Weber Chuang was a keynote speaker at an unnamed conference but make no reference to a slide presentation.  *E.g.*, Exs. M, N, R to Lemieux Decl. (excerpts of deposition transcript of Miller Chen and email exchanges between Chen and Chuang).  Although in securities fraud cases, courts routinely take judicial notice of documents with

4

United States District Court
Northern District of California

1   unquestioned authenticity that demonstrate the information was available to the market during the

2   relevant period, here, whether the slide presentation was made to the public is subject to

3   reasonable dispute.  Fed. R. Evid. 201(b); *cf. In re Nuvelo, Inc. Sec. Litig.*, 668 F. Supp. 2d 1217,

4   1220 (N.D. Cal. 2009).  As such, the Court DENIES the request for judicial notice of Exhibit Q to

5   Lemieux Declaration.

6          As to Exhibits S to Z to Lemieux Declaration, these exhibits are ASM's press releases.

7   Judicial notice of news reports and press releases is appropriate to show "that the market was

8   aware of the information contained in news articles . . . ."  *Heliotrope Gen., Inc. v. Ford Motor*

9   *Co.*, 189 F.3d 971, 981 n.18 (9th Cir.1999); *see also In re Am. Apparel, Inc. S'holder Litig.*, 855 F.

10  Supp. 2d 1043, 1062 (C.D. Cal. 2012) (noting that courts in the Ninth Circuit routinely take

11  judicial notice of press releases).  VIA cites *Orr v. Bank of Am., NT & SA*, for its argument that

12  unauthenticated documents cannot be judicially noticed.  285 F.3d 764, 775 (9th Cir. 2002); VIA

13  Opp'n 13.  However, *Orr* did not concern press releases but instead, excerpts of deposition

14  transcript that lacked a reporter's certification and failed to identify the names of the deponent.

15  285 F.3d at 775.  *Orr* is thus distinguishable.  Accordingly, Court OVERRULES VIA's objections

16  and takes judicial notice of the existence of these press releases but not the truth of the facts

17  therein.  *See, e.g.*, *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001) (permitting a court

18  to take judicial notice of another court's opinion, but not the truth of the facts recited therein).

19          The Court also takes judicial notice of the original complaint filed by VIA in this action, as

20  well as the Wu Publication because those are publicly available documents that are routinely

21  judicially noticed.  *See Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988) (court

22  may take judicial notice of matters of public record); *X One, Inc. v. Uber Techs., Inc.*, No. 16-

23  06050-LHK, 2017 WL 878381, at *4 n.1 (N.D. Cal. Mar. 6, 2017) (noting that "[p]atents are

24  matters of public record and the proper subject of judicial notice") (citation and alterations

25  omitted).

26  **IV.   LEGAL STANDARD**

27          Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary

28  judgment is appropriate if the evidence and all reasonable inferences in the light most favorable to

5

the nonmoving party "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   The current version of Rule 56 authorizes a court to grant "partial summary judgment" to dispose of less than the entire case and even just portions of a claim or defense. *See* Fed. R. Civ. P. advisory committee's note, 2010 amendments; *Ochoa v. McDonald's Corp.*, 133 F. Supp. 3d 1228, 1232 (N.D. Cal. 2015).   As such, a court can, "when warranted, selectively fillet a claim or defense without dismissing it entirely." *Id.*

The moving party "bears the burden of showing there is no material factual dispute," *Hill v. R+L Carriers, Inc.*, 690 F. Supp. 2d 1001, 1004 (N.D. Cal. 2010), by "identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).   In judging evidence at the summary judgment stage, the Court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial." *House v. Bell*, 547 U.S. 518, 559-60 (2006).   A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Celotex*, 477 U.S. at 325; *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Once the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250 (internal quotation marks omitted).   If the nonmoving party's "evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).   Mere conclusory, speculative testimony in affidavits and moving papers is also insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979). For a court to find that a genuine dispute of material fact exists, "there must be enough doubt for a

1 reasonable trier of fact to find for the [non-moving party]."  *Corales v. Bennett*, 567 F.3d 554, 562

2 (9th Cir. 2009).

3 **V.    DISCUSSION**

4     **A.    VIA's Motion for Partial Summary Judgment**

5        VIA seeks summary judgment that (1) ASUS infringes claims 1, 7, 12, and 15 of the '747

6 patent; (2) certain references and devices do not anticipate or render obvious claims 13, 14, and 18

7 of the '187 patent; and (3) certain references and devices do not anticipate or render obvious

8 claims 1, 7, 12, and 15 of the '747 patent.  VIA Mot. 2, ECF 216.  The Court addresses each

9 ground for summary judgment in turn.

10       **i.    Infringement of Claims 1, 7, 12, and 15 of the '747 Patent**

11        VIA seeks summary judgment that the ASM1351, ASM1153, and ASM1053 chips (the

12 "accused products") directly infringe claims 1, 7, 12, and 15 of the '747 patent.  VIA Mot. 2, 8.

13 According to VIA, the opinion of its expert, Mr. Miguel Gomez, establishes that the accused

14 products infringe each of the asserted claims.  *Id.*  VIA argues that ASUS' own expert, Dr. Jacob

15 Baker, provides no opinion rebutting the infringement of the asserted claims.  *Id.*  Further, VIA

16 claims in the reply that ASUS' own interrogatory responses show that ASUS imported and sold

17 the accused products in United States.  VIA Reply 2, ECF 240.  ASUS, in opposition, responds

18 that VIA fails to meet its burden as the moving party of demonstrating in its opening motion that

19 the alleged acts of infringement occurred within the United States.  ASUS Opp'n 19, ECF 235.

20 ASUS also objects to VIA's introduction of their interrogatory responses for the first time in the

21 reply in support of VIA's motion.  Objection to Reply Evid. 3-4, ECF 236.

22       Direct patent infringement is defined in 35 U.S.C. § 271(a):

23     Except as otherwise provided in this title, whoever without authority makes, uses,
offers to sell, or sells any patented invention, within the United States or imports

24     into the United States any patented invention during the term of the patent
therefor, infringes the patent.

25 35 U.S.C. § 271(a).

26       VIA's expert, Mr. Gomez analyzed the accused products and found that they infringe each

27 of the asserted claims.  Gomez Infringement Rpt. ¶¶ 142-230, ECF 216-2.  And ASUS' expert, Dr.

28

United States District Court
Northern District of California

1    Baker does not dispute that conclusion. Ex. 3 to Kroeger Decl. (Baker Dep. Tr.) 163:11-20, ECF

2    216-6 ("you could read the '747 on the accused products").  The sole remaining issues here are

3    whether the infringing conduct occurred in United States and whether the Court should consider

4    the evidence VIA submitted with its reply to show that the conduct occurred United States.  ASUS

5    Opp'n 19.

6          The Court agrees that VIA fails to demonstrate on its opening motion that the alleged acts

7    of infringement occurred within the United States and only supplements the essential evidence on

8    its reply.  However, the evidence submitted by VIA consists of ASUS' own interrogatory

9    responses and the reports of ASUS' experts.  ASUS thus has been on notice of the contents of

10   these exhibits.  In fact, ASUS created these documents.  Nonetheless, at the hearing, the Court

11   offered ASUS leave to file a sur-reply to VIA's late-submitted evidence. *Provenz v. Miller*, 102

12   F.3d 1478, 1483 (9th Cir. 1996) ("[w]here new evidence is presented in a reply to a motion for

13   summary judgment, the district court should not consider the new evidence without giving the

14   [non-]movant an opportunity to respond") (citation omitted).  In response, ASUS represented to

15   the Court that it does not dispute infringement of claims 1, 7, 12, and 15 of the '747 patent by the

16   accused products and declined the leave to file a sur-reply.  Accordingly, based on the evidence

17   submitted to the Court and the lack of dispute by ASUS, the Court GRANTS VIA's motion for

18   partial summary judgment that the ASM1351, ASM1153, and ASM1053 chips (the "accused

19   products") directly infringe claims 1, 7, 12, and 15 of the '747 patent.

20          **ii.     Authentication and Evidence of Publication of the Purported Prior Art**

21          VIA seeks summary judgment that the '187 and '747 patents are not anticipated or

22   rendered obvious by certain references because those references have not been authenticated and

23   ASUS provides no admissible evidence that they are prior art.  VIA Mot. 6-7.[1]  For example, VIA

24   asserts that ASUS cannot authenticate Alan Fiedler, Ross Mactaggart, James Welch, Shoba

25   Krishnan "A 1.0625 Gbps Transceiver with 2x-Oversampling and Transmit Signal Pre-Emphasis,"

---

[1] ASUS pointed out at the hearing that VIA's motion sounds more like a motion in limine to
exclude evidence and not summary judgment.  Although the Court agrees with this sentiment, the
motion does appear to address resolution of discrete claims of obviousness or anticipation based
on ASUS' absence of admissible evidence.  On that basis, the motion is property stated.

1    IEEE International Solid State Circuits Conference (1997) (the "Fielder paper"), because neither

2    ASUS' expert, Dr. Baker, nor other witnesses have personal knowledge that the Fiedler paper is

3    what it purports to be.  *Id.* at 18; Ex. 6 to Kroeger, ECF 216-9.  VIA further argues that the 1997

4    date appearing on the Fielder paper is hearsay and cannot establish that it was publicly available

5    prior to the '187 patent priority date.  VIA Mot. 18.  VIA also attacks the authenticity of a

6    document in regard to a device called "TLK2500 Multigigabit Transceiver," purportedly

7    evidenced by the "TLK2500IRCP 1.6 Gbps to 2.5 Gbps TRANSCEIVER" Datasheet ("TLK2500

8    Datasheet").  *Id.* at 18; Ex. 7 to Kroeger, ECF 216-10.  VIA avers that neither Dr. Baker nor any of

9    ASUS' other witnesses have personal knowledge of the TLK2500 Datasheet.  VIA also argues

10   that the dates appearing on the datasheet are hearsay and cannot establish that it was publicly

11   available prior to the '187 patent priority date.  VIA makes similar arguments against six other

12   references as not authenticated and hearsay.  VIA further contends that even if ASUS' witnesses,

13   Dr. Baker and Barbara Chen, have knowledge to authenticate these documents, they were never

14   disclosed as fact witnesses with such knowledge, and their testimony on this issue should be

15   excluded pursuant to Fed. R. Civ. Proc 37(c)(1).  VIA Reply 4-5, ECF 240.

16        ASUS counters that Dr. Baker can authenticate the Fielder paper in various ways,

17   including testifying as to how he downloaded the paper from the IEEE Xplore Digital Library, as

18   he testified in his deposition.  Bhakar Decl. ¶ 5.  According to ASUS, the content of the paper is

19   admissible under several exceptions to the hearsay rule, including record of a regularly conducted

20   activity, commercial publications, and statements in periodicals, for example.  ASUS Opp'n 2,

21   ECF 235.  As to the TLK2500 Datasheet, ASUS argues that it is self-authenticating under Fed. R.

22   Evid. 902(7) as trade inscriptions, signs, tags, or labels.  *Id.* at 7.  ASUS asserts that it can be

23   further authenticated by Dr. Baker based on testimony as to how he obtained the document from

24   the internet.  *Id.* at 8.  ASUS further claims that the date of publication is admissible under the

25   business record or statement of intent exceptions to the hearsay rule under Fed. R. Evid. 803(3).

26   *Id.* at 8.

27        With respect to the Fielder paper, there are disputed issues as to whether it may be

28   admissible at trial.  Contrary to VIA's arguments, the Fielder paper may be admissible at trial as

United States District Court
Northern District of California

9

United States District Court
Northern District of California

self-authenticating evidence because it is a "[p]rinted material purporting to be a newspaper or periodical." Fed. R. Evid. 902(6).  For this reason alone, summary judgment based on the Fielder paper's purported lack of authentication cannot be granted.  The Court need not reach the other potential grounds for authentication proffered by ASUS.  Based on this determination, the Court also need not determine whether the testimony of Baker and Chen should be excluded under Rule 37 for the purpose of this motion in connection with the Fielder paper's admissibility.

Whether the Fielder paper could be established as prior art also presents disputed issues. ASUS has proffered testimony of Mr. Chi Chang and Mr. Biky Lin who were supposedly familiar with the Fielder paper and who could testify to its public availability. Ex. 4 to Bhakar Decl. 14:2-6, 34:25-36:8; 51:1-16, ECF 235-21.  Although VIA argues that ASUS points to no evidence that Messrs. Chang and Lin had personal knowledge of the Fielder paper, the excerpt of deposition transcript submitted by ASUS suggests that Messrs. Chang and Lin could have relevant testimony. As such, VIA has not established the absence of a triable issue of material fact on this point. Furthermore, Fed. R. Evid 803(18) provides a possible hearsay exception for admissibility of the prior art date, if "(A) the statement is called to the attention of an expert witness on cross-examination or relied on by the expert on direct examination; and (B) the publication is established as a reliable authority by the expert's admission or testimony, by another expert's testimony, or by judicial notice."  Although VIA contends that ASUS has not established that the Fielder paper is "a reliable authority," this argument is insufficient to eliminate triable issues.  At this juncture, the Court only decides whether there is a genuine issue for trial so the proper inquiry is whether it is possible for ASUS to present the evidence in an admissible form and not whether the evidence is already in an admissible form. *See e.g.*, *Netscape Commc'ns Corp. v. ValueClick, Inc.*, 707 F. Supp. 2d 640, 648 (E.D. Va. 2010).  Because VIA has not eliminated the possibility that ASUS could introduce this evidence in an admissible form, the Court denies VIA's motion summary judgment based on the Fielder paper.

As to "5 Gbps serial link transmitter with pre-emphasis," by Chih-Hsien Lin, Chung-Hong Wang, and Shyh-Jye Jou ("Lin Reference"), this reference is purported to be a periodical so it could also be self-authenticating like the Fielder paper.  Similarly, the prior art date associated

United States District Court
Northern District of California

1   with the Lin Reference could qualify for the hearsay exception pursuant to Fed. R. Evid. 803(18).

2   The Court thus denies VIA's motion for summary judgment based on the Lin Reference.

3         With respect to the TLK2500 Datasheet, Dr. Baker's testimony as to how he obtained the

4   print out from the internet would be necessary because it is not self-authenticating.  As long as Dr.

5   Baker's testimony is "sufficient to allow a reasonable juror to find that . . . printouts were

6   authenticated," triable issues remain on whether the reference is what it purports to be.  *United*

7   *States v. Tank*, 200 F.3d 627, 630 (9th Cir. 2000).  Separately, this document does not appear to be

8   self-authenticating under Fed. R. Evid. 902(7) because there is no evidence showing that this

9   datasheet has been "affixed [to a product] in the course of business and indicating origin,

10  ownership, or control."

11        However, VIA poses a Rule 37 objection to Dr. Baker's testimony.  VIA Reply 4, ECF

12  240.  ASUS has been on notice of this Rule 37 issue since VIA's objection was filed on March 23,

13  2017, but no motion to supplement ASUS' Rule 26 disclosure has been made to date.

14  Accordingly, the Court agrees with VIA's objection that ASUS did not timely disclose Dr. Baker

15  as a fact witness and will exclude from trial Dr. Baker's fact testimony in connection with the

16  TLK2500 Datasheet.  Because ASUS has not provided any other proper means to introduce

17  TLK2500 Datasheet other than Dr. Baker's fact testimony, the Court GRANTS VIA's motion for

18  summary judgment based on the inadmissibility of the TLK2500 Datasheet as well as its

19  publication date.

20        With respect to VIA's motion for summary judgment that the '747 patent is not anticipated

21  or rendered obvious by five other references, this part of the motion is rendered moot by the

22  Court's determination below that the asserted claims of the '747 patent are invalid.  Accordingly,

23  the Court declines to reach the authentication and hearsay issues for the remaining five references.

24        **B.**    **ASUS' Motion for Partial Summary Judgment**

25        ASUS seeks summary judgment in its favor (1) that the asserted claims 1, 7, 12, and 15 of

26  the '747 patent are obvious over U.S. Patent Publ. 2010/0032818 ("Pilling") in view of USB 3.0

27  Specification revision 1.0; and (2) that VIA's trade secret claims are time barred.  ASUS Mot. 2-3,

28  14-15, ECF 219; Ex. 4 to Bhakar Decl. ("Pilling"), ECF 219-5.  The Court addresses each ground

1    for summary judgment in turn.

2        **i.    Obviousness of the Asserted Claims of the '747 Patent**

3        The '747 patent is directed to a leadframe type package technology for semiconductor

4    integrated circuits.  '747 patent 1:18-20.  The patent identifies that an objective of its invention

5    was to establish leads with low inductance so as to improve signal-to-noise ratio.  *Id.* at 1:22-27

6    (noting that a "lower inductance is advantageous to reduce power bounce, and thereby to reduce

7    noise coupling").  It explains that the "total inductance of a power net is composed of both self

8    inductance and mutual inductance."  *Id.* at 1:52-53.  "[T]o solve the problem in the prior art where

9    the mutual inductance between the conductive wires . . . gets increased due to a limited distance

10   between the conductive wires," the '747 claimed invention provides "a plurality of conductive

11   wires" "connected to a plurality of power leads so as to lower down the mutual inductances

12   between the conductive wires."  *Id.* at 2:66-3:6.  Claim 1 recites:

13           A leadframe, suitable for a leadframe type package and comprising:

14           a chip base; and

15           a plurality of leads, constituting a plurality of lead lanes, wherein one of
         the lead lanes comprises:

16           a pair of first differential signal leads;

17           a pair of second differential signal leads;

18           a pair of third differential signal leads, wherein the pair of second
         differential signal leads is arranged between the pair of first differential signal
19       leads and the pair of third differential signal leads; and

20           a first power lead, arranged between the pair of first differential signal
         leads and the pair of second differential signal leads,

21           wherein one of the pairs of differential signal leads has a half-duplex
         transmission mode and two of the other pairs of differential signal leads have
22       a full-duplex transmission mode.

23   *Id.* at 6:7-24.

24       ASUS argues that the asserted claims of the '747 patent are obvious over Pilling in view of

25   the USB 3.0 specification revision 1.0.  According to ASUS, Pilling discloses all of the limitations

26   of the asserted claims except for the requirement that "one of the pairs of differential signal leads

27   [of a lead lane] has a half-duplex transmission mode and two of the other pairs of differential

28   signals leads have a full-duplex transmission mode."  ASUS Mot. 2-3.  ASUS then avers that the

United States District Court
Northern District of California

United States District Court
Northern District of California

1    USB 3.0 specification supplies this limitation: USB 3.0 differential signal pair D+/D- is one

2    differential "signal pair having a half-duplex transmission mode," and USB 3.0 differential signal

3    pairs Tx+/Tx- and Rx+/Rx- are "two differential signal pairs having a full-duplex transmission

4    mode." *Id.* at 3. Given the small and limited number of possible arrangements of three pairs of

5    differential signal leads that were known in the prior art, ASUS concludes that the claimed

6    arrangement of leads in the asserted claims of the '747 patent is no more than a predictable use of

7    known prior art elements. *Id.*

8         VIA does not dispute that the USB 3.0 specification provides the missing limitation.

9    However, VIA argues that the asserted claims of the '747 patent cannot be found obvious on

10   summary judgment because ASUS has failed to establish that it is undisputed that a person of

11   ordinary skill in the art ("POSITA") would be motivated to combine Pilling with the USB 3.0

12   standard. VIA Opp'n 22, ECF 237. VIA also argues that ASUS has not established that the

13   particular order of leads required by the asserted claims would be obvious to try. *Id.* at 24.

14        A patent is presumed to be valid. 35 U.S.C. § 282(a). A party challenging the validity of a

15   patent bears the burden of proving invalidity by clear and convincing evidence. *Microsoft Corp.*

16   *v. I4I Ltd. P'ship*, 564 U.S. 91, 102 (2011). A patent is obvious if "the differences between the

17   subject matter sought to be patented and the prior art are such that the subject matter as a whole

18   would have been obvious at the time the invention was made to a person having ordinary skill in

19   the art to which said subject matter pertains." 35 U.S.C. § 103(a); s*ee also KSR Int'l Co. v.*

20   *Teleflex Inc.*, 550 U.S. 398, 406 (2007). "Obviousness is a question of law." *Apple Inc. v.*

21   *Samsung Elecs. Co.*, 839 F.3d 1034, 1047 (Fed. Cir. 2016). However, several factual inquiries

22   underlie the determination of obviousness: "the scope and content of the prior art, the differences

23   between the claims and the prior art, the level of ordinary skill in the art, and secondary

24   considerations." *Id.* (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966)); *KSR*, 550 U.S. at

25   427. "The Court must examine each of those four factors prior to reaching a conclusion on

26   obviousness, and must do so 'without any hint of hindsight.'" *Star Sci., Inc. v. R.J. Reynolds*

27   *Tobacco Co.*, 655 F.3d 1364, 1375 (Fed. Cir. 2011) (citation omitted). Further, secondary

28   considerations "may often be the most probative and cogent evidence [of nonobviousness] in the

record," which include "commercial success, long felt but unsolved needs, and failure of others." *Id.*; *KSR*, 550 U.S. at 399.

A patent comprised of several elements is not proven obvious "merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 550 U.S. at 418. The question turns on whether "a person of ordinary skill can implement a predictable variation." *Id.* at 417. If so, then 35 U.S.C. § 103 "likely bars its patentability." *Id.* "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id.* at 416.

The Court will now proceed through the factual inquiries described in *Graham,* as informed by *KSR* and its progeny. Since obviousness is a legal determination for the Court, the question is whether, construing the facts relating to the underlying *Graham* factors in the light most favorable to VIA, there is a genuine issue of material fact as to one or more of those factors sufficient to preclude the legal determination of obviousness. As a preliminary matter, neither party argues that any of the prior art references teaches away from the claimed invention so the Court need not consider that issue. The Court thus examines below the teachings of the prior art references and the motivation to combine under *Graham* Factor 1.

a. *Graham* Factor 1: Scope and Content of the Prior Art

The parties do not dispute that Pilling discloses all of the limitations of claims 1, 7, 12 and 15 of the '747 patent except for the limitation "wherein one of the pairs of differential signal leads has a half-duplex transmission mode and two of the other pairs of differential signal leads have a full duplex transmission mode."[2] ASUS Mot. 4-5; *see generally* VIA Opp'n 22-25; *e.g.*, Pilling Figs. 2C and 3 (showing a plurality of leads for transmitting signals); Pilling at 3:48-52 ("An outer die pad 120 can be down-bonded to a pad 122 on a buried lead-frame 124, which is mounted with solder plated vias to an exposed ground die pad 126"); *see also* Baker Invalidity Decl. ¶¶ 62-72,

---

[2] Although independent claims 7 and 15, and dependent claim 12 are also asserted in addition to independent claim 1, VIA does not dispute that Pilling supplies the claimed features not present in claim 1, such as "an encapsulant," in claim 7 and "chip base [serving] as a grounding interface" in claim 12. Baker Invalidity Decl. ¶¶ 60, 76; *see generally* VIA Opp'n 22-25. Given that claims 7, 12, and 15 are not substantially different from claim 1 for the purpose of determining obviousness, the obviousness analysis of claim 1 would apply equally to the other asserted claims.

United States District Court
Northern District of California

1   ECF 219-42 (detailing the disclosure of Pilling corresponding to the limitations of the asserted

2   claims).  This is further bolstered by the patent prosecution history, where the patent applicants'

3   sole argument for patentability was that Pilling did not disclose the limitation that "one of the pairs

4   of differential signal leads has a half-duplex transmission mode and two of the other pairs of

5   differential signal leads have a full-duplex transmission mode."  Ex. 2 to Bhakar Decl. 10 (Jan. 22,

6   2013 Resp. to Office Action), ECF 219-3.

7           The parties also do not dispute that the USB 3.0 Specification, revision 1, is prior art

8   (published November 12, 2008), and mandates a pair of half-duplex mode differential signals and

9   two pairs of full-duplex mode differential signals.  Ex. 3 to Bhakar Decl. 4 (USB 3.0 specification

10  Rev. 1.0 p. 2-2), ECF 219-4; ASUS Mot. 9; *see generally* VIA Opp'n 22-25.

11          Because all claim limitations are found in these two prior art references, the question

12  becomes "whether a [POSITA] would have been motivated to combine the prior art to achieve the

13  claimed invention."  *In re Warsaw Orthopedic, Inc.*, 832 F.3d 1327, 1333 (Fed. Cir. 2016) (citing

14  *DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1360

15  (Fed. Cir. 2006)); *see KSR*, 550 U.S. at 418 ("[I]t can be important to identify a reason that would

16  have prompted a person of ordinary skill in the relevant field to combine the elements in the way

17  the claimed new invention does.").  A motivation to combine can be found in "any need or

18  problem known in the field of endeavor at the time of invention and addressed by the patent."  *Id.*

19  at 420.  "[T]he analysis need not seek out precise teachings directed to the specific subject matter

20  of the challenged claim, for a court can take account of the inferences and creative steps that a

21  person of ordinary skill in the art would employ."  *Id.* at 418.  Nevertheless, the "analysis should

22  be made explicit."  *Id.*; *see also In re Nuvasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016) ("Our

23  precedent dictates that the PTAB must make a finding of a motivation to combine when it is

24  disputed.").  A patent may also be proved obvious by showing that the combination of known

25  elements was obvious to try.  *KSR*, 550 U.S. at 421.  As the Supreme Court has explained:

26          When there is a design need or market pressure to solve a problem and there
            are a finite number of identified, predictable solutions, a person of ordinary

27          skill has good reason to pursue the known options within his or her technical
            grasp. If this leads to the anticipated success, it is likely the product not of

28          innovation but of ordinary skill and common sense. In that instance the fact

United States District Court
Northern District of California

1    that a combination was obvious to try might show that it was obvious under §
2    103.

*Id.*

3         The Court finds that several motivations to combine Pilling and the USB 3.0 specification

4    existed at the time of the invention, which include: (1) disclosures in the references themselves;

5    (2) the nature of the problem; and (3) the knowledge of a POSITA.  *See KSR*, 550 U.S. at 407

6    (citation omitted).  The Court also finds that the combination of Pilling and the USB 3.0

7    specification was obvious to try.  The Court discusses each in turn.

8                    1.  Explicit Disclosures of Motivation to Combine in the References

9         Aside from providing the claim limitations discussed above, Pilling and the USB 3.0

10    specification further teach the following.  Pilling teaches "a lead frame package that can be

11    utilized for high performance serializer/deserializer (SerDes) applications."  Pilling 1:6-9.  Pilling

12    also teaches that signal speed can depend on multiple factors, including "inductance of wire

13    bonds."  *Id.* at 1:20.  It further underscores "[p]oor signal integrity" as a problem in the field and

14    that it aimed to develop leadframe packages to "meet the rate requirements of modern SerDes

15    systems."  *Id.* at 1:25-32.  It then teaches that the "improved lead frame packages" "allow serial

16    data transfer rates in excess of 2 Gbits/sec."  *Id.* at 3:21-23; Baker Invalidity Decl. ¶ 52.

17         The USB 3.0 specification provides the standard specification for Universal Serial Bus 3.0

18    communication for developers.  Ex. 3 to Bhakar Decl. ("USB 3.0 specification"), ECF 219-4.  The

19    USB 3.0 specification "defines the next generation USB industry-standard, USB 3.0."  *Id.* ¶ 1.2.  It

20    states that the data rate of USB 3.0 reaches 5.0 Gbps while the prior generation of USB, USB 2.0,

21    has a high-speed data rate of 480 Mbps.  *Id.* ¶ 3.1.4.  This standard would allow end users to

22    experience USB 3.0 connection just like a USB 2.0, but at faster data transmission rate.  *Id.* ¶ 1.6.

23         As this review of the references demonstrates, Pilling and the USB 3.0 specification

24    references themselves provide the motivation to combine.  Pilling teaches leadframe packages

25    directed to SerDes applications, of which USB is a particular type.  Pilling 1:6-9.  Pilling also

26    teaches that its leadframe packages would allow data transmission rate in excess of 2 Gbits/sec.

27    *Id.* at 3:21-23.  And the USB specification states that products employing USB 3.0 would transmit

28    data at a higher speed than USB 2.0 and a POSITA would be aware of various industry standards

United States District Court
Northern District of California

16

including USB 2.0, which provides a high-speed data transfer rate of only 480 Mbps.  *E.g.*, Baker

Invalidity Decl. ¶ 41; USB 3.0 specification ¶ 3.1.4.  Given that USB 3.0's high speed transfer rate

can reach 5 Gbps, several times faster than USB 2.0, and that Pilling teaches a serial data

transmission technology that could also allow data transmission rate over 2 Gbps, a POSITA

would be motivated to combine the teachings of the two references to create products that would

transmit data faster than the older generation of USB.  *See Dystar*, 464 F.3d at 1371 (finding

motivation to combine two references directed to indigo dyeing process because a POSITA could

devise a "cheaper, faster, and more convenient" indigo dyeing process").

### 2.   Implicit Motivation to Combine in Nature of the Problem.

There is also implicit motivation to combine based on the knowledge of POSITA and the

nature of the problem, which includes the need for faster data transmission rate while maintaining

signal integrity.  The Federal Circuit in *Richardson-Vicks Inc. v. Upjohn Co.* was confronted with

a similar situation and found an implicit motivation to combine the prior art references.  122 F.3d

1476, 1477 (Fed. Cir. 1997).  The patent claims at issue in *Richardson-Vicks* combined "two well-

known ingredients, the analgesic ibuprofen and the decongestant pseudoephedrine" "for the relief

of cough, cold, and flu symptoms." *Id.*  One main question was whether combining the two

ingredients in a single form, such as a tablet, would be obvious. *Id.* at 1480.  Affirming the lower

court's JMOL finding of obviousness, the Federal Circuit first noted that the prior art

combinations of aspirin or acetaminophen and a pseudoephedrine in a single unit dosage were

already known to be effective for treating sinus headaches because both drugs help to alleviate the

associated pain. *Id.* at 1483.  The court also found that ibuprofen was a known analgesic that was

interchangeable with either aspirin or acetaminophen. *Id.*  Lastly, the court found the Food and

Drug Administration ("FDA")'s approval of ibuprofen as an over-the-counter medicine an

important reason for the motivation to combine. *Id.* at 1484.  According to the Federal Circuit,

"[t]he motivation to substitute ibuprofen for either acetaminophen or aspirin in the prior art . . . to

produce the claimed combination would have been particularly strong for the ibuprofen

manufacturers." *Id.*

Here, similar to an impending FDA approval, the USB 3.0 specification emerged as the

United States District Court
Northern District of California

"next generation USB industry-standard" after USB 2.0, and a motivation for developers in the field to adopt this standard in their devices would be particularly strong. *E.g.*, USB 3.0 ¶ 1.2, 1.6, 3.1.4. Just as in *Richardson-Vicks*, here too, the nature of the problem and the knowledge of a POSITA inherently provided a motivation to combine. The problem in the relevant field includes the need for faster data transmission while still maintaining signal integrity, which includes having an acceptable level of signal-to-noise ratio. Pilling at 1:25-32; Baker Invalidity Decl. ¶¶ 53-54, 119. When a universal standard for faster data transmission became available, a POSITA would want to combine Pilling with USB 3.0 to take advantage of the faster speed, not unlike the drug manufacturers in *Richardson-Vicks* who wanted to take advantage of convenience and market demands of ibuprofen as an over-the-counter drug. *E.g.*, Baker Invalidity Decl. ¶ 125 (noting "that chip makers would want to have chips with the latest I/O industry standards). In addition to the need for faster data transmission, the problem faced by a POSITA includes signal integrity that can be affected by noise. Pilling expressly highlights this problem and provides teachings on this issue. *E.g.*, Pilling at 1:20 (teaching that inductance could affect signal speed). While the USB 3.0 specification does not explicitly mention inductance as a factor affecting signal integrity, it also lists "signal integrity" as one of the issues the USB 3.0 specification was required to address, further underscoring that a POSITA would need to confront this problem at the time of the invention. USB 3.0 Specification ¶¶ 3.2.4, 5.2.3, 5.3.1.1; Baker Invalidity Decl. ¶¶ 89-90. Improving the rate of data transmission while maintaining signal integrity is thus a problem based on knowledge of the POSITA. Given that both references provide teaching on this subject matter, a POSITA would be motivated to combine the references to address the problem. *See also Dystar*, 464 F.3d at 1368 (finding a motivation to combine and holding "[b]ecause the desire to enhance commercial opportunities by improving a product or process is universal—and even common-sensical—we have held that there exists in these situations a motivation to combine prior art references even absent any hint of suggestion in the references themselves").

ASUS' expert, Dr. Baker points to specific teachings in the references in further support of a motivation to combine. Specifically, Dr. Baker states that Pilling has highlighted problems in serial data transmission, including "crosstalk between signal pairs" and "package inductive ground

United States District Court
Northern District of California

1    bounce," all of which affect signal integrity and limits the speed of data transmission.  Baker

2    Invalidity Decl. ¶¶ 52-54.  Interestingly, Dr. Baker also makes the observation that the problems

3    addressed by Pilling are nearly identical to those in the '747 patent.  *Id.* ¶¶ 71-72, 119 (noting that

4    both Pilling and the '747 patent recognize the problems of inductance, capacitance and resistance

5    of wire bonds); *see e.g.*, '747 patent at 1:22-27 (noting that a "lower inductance is advantageous to

6    reduce power bounce, and thereby to reduce noise coupling").  Dr. Baker's opinions thus further

7    bolster the conclusion that the nature of the problems known to POSITA at the time of invention

8    would provide the motivation to combine the two references.  *See KSR*, 550 U.S. at 410 (holding

9    that "any need or problem known in the field of endeavor at the time of invention and addressed

10   by the patent can provide a reason for combining the elements in the manner claimed").

11   Accordingly, the Court finds that ASUS has established a clear and convincing prima facie case

12   for a motivation to combine Pilling and the USB 3.0 specification.

13        VIA counters that ASUS relies solely on attorney argument and has not pointed to any

14   evidence of a motivation to combine.  This argument, however, is belied by the prior art references

15   and Dr. Baker's opinions discussed above.  VIA also relies on a statement made by Mr. Gomez, its

16   expert, opining that "[t]he disparate nature of the asserted references indicates that they were

17   attempting to solve different problems.  Furthermore, each reference allegedly

18   provides a solution that is complete, and there would be no reason to substitute or add parts from

19   any other reference."  Gomez Validity Rpt. ¶ 156, ECF 226.  The Court disagrees.  First, Mr.

20   Gomez points to nothing in Pilling, USB 3.0 specification, or other evidence to support his

21   conclusion that these two prior art references are of a "disparate nature" and attempt to solve

22   different problems.  In fact, this opinion neglects to consider that both references are in the field of

23   serial data transmission and directed to improving data transfer rate while maintaining signal

24   integrity.  *E.g.*, Baker Invalidity Decl. ¶¶ 51, 67; *see generally* USB 3.0 specification.  Mr.

25   Gomez's conclusory, speculative testimony is insufficient to raise genuine issues of fact and defeat

26   summary judgment.  *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979);

27   *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1068 (Fed. Cir. 2005) (finding that the

28   expert declaration lacked substantive factual guidance and could not carry the burden on summary

judgment); *Dako Denmark A/S v. Leica Biosystems Melbourne Party Ltd.*, 662 F. App'x 990, 994 (Fed. Cir. 2016) (rejecting a party's argument that there was no motivation to combine where the argument was only supported by testimony from the party's expert and named inventor).

VIA's reliance on *Mintz v. Dietz & Watson, Inc.* is inapposite.  679 F.3d 1372, 1377 (Fed. Cir. 2012).  The *Mintz* court vacated the lower court's finding of obviousness because the lower court combined a reference in the knitting art with a reference in meat encasement art without providing a reason as to why a POSITA would combine these two references.  *Id.*  Here, as discussed above, Pilling and the USB 3.0 specification are both in the field of serial data transmission and both contain teachings directed to signal speed and integrity.  *Mintz* thus has limited applications here at least for these reasons.

The Court has already concluded a motivation to combine based on the references themselves, the nature of the problem, and the knowledge of POSITA.  Alternatively, the Court also finds there is a motivation to combine because it would be obvious to try implementing a new industry standard, namely USB 3.0, in a pre-existing technology taught by Pilling.

### 3.   Obvious to Try

It would be "obvious to try" when (1) the problem to be solved arises out of a design need or market pressure; (2) the solution to the problem involves a finite number of identified and predictable solutions; (3) a person of ordinary skill in the art would have good reason to pursue the known options within his or her technical grasp; and (4) such pursuit leads to the anticipated success."  *Oatey Co. v. IPS Corp.*, 665 F. Supp. 2d 830, 865 (N.D. Ohio 2009) (citing *KSR*, 550 U.S. at 421).  *Oatey* illustrates an apt application of the "obvious to try" doctrine relating to an improvement to washing machine outlet boxes ("WMOB").  665 F. Supp. 2d at 833.  The question was whether a dual-drain-port design where the drain ports were placed side-by-side and connected with a funnel-shaped common tailpiece was obvious in light of the prior art.  *Id.* at 865.  The court first noted that the dual-drain-port was inspired by a need to comply with a change in a municipal plumbing code that required separate drain ports for different sources of waste water, for example, from a washing machine versus another appliance.  *Id.* at 834, 853, 865.  The design also aimed to avoid having to perform numerous welds to connect the two drain ports.  *Id.* at 865.

United States District Court
Northern District of California

The court reasoned that there were only so many ways to arrange two faucets and two drain ports in a WMOB so moving the drain ports next to each other is but one of a "finite number of identified, predictable solutions." *Id.* at 865. Finally, because the funnel-shaped tailpiece was a well-established solution to direct "multiple streams of effluent toward a single outlet," the court found that the patented invention was obvious to try. *Id.* at 867.

Our case here is similar to *Oatey* in that the USB 3.0 specification, akin to the municipal plumbing code, would motivate a POSITA to adopt and comply with the USB 3.0 standard. First, this is not the case where there are "numerous parameters" to try. *See Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1366 (Fed. Cir. 2007). Instead, there was a limited number of solutions driven by market demands. The market required compatibility between electronic devices and improved speed of data transmission so a POSITA either needed to adopt the USB 3.0 standard or get left behind with the slower USB 2.0. There is no reason for a POSITA to eschew an industry standard because there is little practical use for a product that is not compatible with other devices on the market. Second, this is not the case where the prior art teaches merely to pursue a "general approach that seemed to be a promising field of experimentation" or "gave only general guidance as to the particular form of the claimed invention or how to achieve it." *Pfizer*, 480 F.3d at 1366 (citations omitted). Instead, the USB 3.0 specification gave specific guidance. The case here is simpler than *Oatey*, as there are no differences between the combination of prior art and the asserted claims of the '747 patent, so there is no "gap between the prior art and a conclusion of obviousness" to bridge. *See Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1329 (Fed. Cir. 2009). Rather, the market demands directly provided the predictable solution here, combining the USB 3.0 standard with Pilling, and VIA provides no evidence suggesting that a POSITA would have a reason to look for a different solution.

Furthermore, a POSITA seeking to combine the limitation "wherein one of the pairs of differential signal leads has a half-duplex transmission mode and two of the other pairs of differential signal leads have a full duplex transmission mode," as provided by the USB 3.0 specification, with Pilling, would require no more than routine experimentation to arrive at predictable results. The claims merely require one pair of half-duplex differential signal leads and

two pairs of full duplex differential signal leads placed in a leadframe in no particular order.  '747

patent at 6:7-24; Baker Invalidity Decl. ¶¶ 111-114.  As explained by Dr. Baker, what was

required to place half-duplex and full-duplex leads in a leadframe package as taught by Pilling was

well-known in the art.  *Id.* ¶¶ 115-18.  Pilling also places no restrictions that would prevent a

POSITA to place one pair of half-duplex and two pairs of full-duplex leads in its leadframe

package.  *Id.* ¶¶ 118, 121.  VIA provides no evidence to rebut the opinion that it would be within a

POSITA's capability to make the combination and that the combination would produce the

anticipated successful results.  Accordingly, the ASUS' has presented a clear and convincing

prima facie case that the combination of Pilling and the USB 3.0 specification would be obvious to

try.

### 4.   Common Sense Approach

A POSITA would similarly combine the two references based on his logic or "common

sense," which is an additional approach to determine obviousness.  *Wyers v. Master Lock Co.*, 616

F.3d 1231, 1239 (Fed. Cir. 2010) (holding that a "legal determination of obviousness may include

recourse to logic, judgment, and common sense, in lieu of expert testimony"); *KSR*, 550 U.S. at

421 ("Our suggestion test is in actuality quite flexible and not only permits, but *requires*,

consideration of common knowledge and common sense") (citing *Dystar*, 464 F.3d at 1367)

(emphasis in original).

*Perfect Web* is instructive here as the Federal Circuit affirmed a summary judgment of

obviousness based on the common sense approach.  587 F.3d at 1330.  The claims at issue in

*Perfect Web* concerned a method of email distribution to ensure that all emails have been

successfully transmitted to the target recipients.  *Id.* at 1326.  The parties agreed for the purpose of

the appeal that the first few steps of transmitting bulk emails and calculating the number of emails

that have been successfully received by recipients were prior art.  *Id.* at 1327.  Thus, the issue was

whether the last step of repeating the earlier steps "until said calculated quantity exceeds said

prescribed minimum quantity" was obvious.  *Id.* at 1330.  The court found this step obvious based

on common sense; and stated that "[i]f 100 e-mail deliveries were ordered, and the first

transmission delivered only 95, common sense dictates that one should try again. One could do

United States District Court
Northern District of California

little else." *Id.*  In reaching this conclusion, the court found the case to be an example where expert opinion was not a prerequisite "because the technology will be easily understandable without the need for expert explanatory testimony." *Id.* at 1329-30.  It further held that an analysis of obviousness "may include recourse to logic, judgment, and common sense available to the person of ordinary skill that do not necessarily require explication in any reference or expert opinion." *Id.* at 1329.  Nevertheless, the court also examined the submitted expert evidence and found it to support a conclusion of obviousness. *Id.* at 1330.  Finally, the court held that on summary judgment, "to invoke 'common sense' or any other basis for extrapolating from prior art to a conclusion of obviousness, a district court must articulate its reasoning with sufficient clarity for review." *Id.*

The asserted claims of the '747 patent are amenable to this analysis and disposition.  As noted above, it is well known in the field that the market demands faster data transmission as well as compatibility among computer devices.  Consumers generally "want things faster" and the USB 3.0 was released as a new, faster USB I/O standard.  *E.g.*, Baker Invalidity Decl. ¶ 124 ("It is a well-established feature of the computer industry to have faster devices that communicate with one another faster and pass larger amounts of information in a shorter amount of time.").  Common sense dictates that a POSITA would aim to adapt existing serial data transmission technology as taught by Pilling, to the new standard.

VIA also fails to raise a disputed issue of material fact with respect to the common sense approach.  VIA argues that ASUS only presents attorney arguments and that VIA's expert's opinion that Pilling and USB 3.0 specification are of disparate nature creates disputed issues.  VIA Opp'n 22-23.  Again, as discussed above, ASUS has not just provided attorney arguments but has also presented clear and convincing evidence in support of a prima facie case for obviousness in the form of well-supported expert opinions and other evidence.  Further, as *Perfect Web* noted, expert evidence is not necessary in certain cases when "logic, judgment, and common sense" dictates a solution that is easily understandable.  Even when expert evidence is considered, as the Court has done above, Mr. Gomez's conclusory statement regarding the disparate nature of the prior art references cannot raise a genuine issue of material fact where the prior art references

themselves, ASUS' expert opinions, and other evidence clearly and convincingly support a conclusion of obviousness.  As such, ASUS' has also presented a prima facie case of obviousness based on the common sense approach.

      b.   *Graham* Factor 2: Differences between the Prior Art and the Claimed Invention

As discussed above for the scope and content of the prior art, the combination of Pilling and the USB 3.0 specification discloses all of the elements of the asserted claims.  As such, with respect to this *Graham* factor, the Court finds that there is no difference between the combination of prior art references and the claimed invention.

      c.   *Graham* Factor 3: Level of Ordinary Skill in the Art

The level of ordinary skill in the art is undisputed by the parties.  According to VIA's expert, Mr. Gomez, the differences between his opinion on this *Graham* factor and Dr. Baker's are small enough that they do not affect Mr. Gomez's opinions on invalidity.  Gomez Validity Rpt. ¶ 31.  A person of ordinary skill in the art as of the time of the '747 patent would have a bachelor's degree in electrical engineering, computer engineering, physics, or computer science, and two years of industry experience working in the design of semiconductor chips.  More education, such as a master's degree, could count for a year of experience.  One of ordinary skill in the art would be aware of the various types of packaging used at that time, including leadframe type packages known prior to March 2009, and would be aware of the I/O signals used in various I/O industry standards including USB.  Baker Invalidity Decl. ¶ 41.  VIA does not object to this description of the level of POSITA on ASUS's motion for partial summary judgment.

      d.   *Graham* Factor 4: Relevant Secondary Considerations

Once a *prima facie* case of obviousness has been established, the burden then shifts to the patent owner to present evidence of secondary considerations of non-obviousness in order to overcome the prima facie showing.  *See In re Huang*, 100 F.3d 135, 139 (Fed. Cir. 1996).  Secondary considerations may include evidence of commercial success, long-felt but unsolved needs, and/or the failure of others, among other things. *Graham*, 383 U.S. at 17-18.  However, where the claimed invention represents no more than the predictable use of prior art elements

United States District Court
Northern District of California

1    according to their established functions, secondary considerations are inadequate to establish

2    nonobviousness as a matter of law.  *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir.

3    2010) (citing *KSR*, 550 U.S. at 417).

4         ASUS argues that there is no evidence of any market demand being driven specifically by

5    the particular type of lead arrangement that has USB 3.0 differential leads spaced apart by at least

6    one power lead or whether there is down bond on the leadframe, as required by Claim 12.

7    ASUAS Mot. 12.   In opposition, VIA relies on Mr. Gomez's opinions that there is evidence of

8    commercial success.  VIA Opp'n 25.

9         Thus, the only secondary indicia of nonobviousness raised by VIA is commercial success.

10   However, the Federal Circuit has required that "[a] nexus between the merits of the claimed

11   invention and evidence of secondary considerations is required in order for the evidence to be

12   given substantial weight in an obviousness decision."  *Muniauction, Inc. v. Thomson Corp.*, 532

13   F.3d 1318, 1327 (Fed. Cir. 2008).  Here, the Court finds no evidence supporting a nexus between

14   the commercial success and the invention claimed by the '747 patent.  As opined by Dr. Baker,

15   there is no evidence of any market demand being driven specifically by the particular type of lead

16   arrangement that has USB 3.0 differential leads spaced apart by at least one power lead or whether

17   there is down bond on the leadframe as required by dependent Claim 12.  Baker Invalidity Decl. ¶

18   124.  VIA proffers a single statement by Mr. Gomez in support of secondary considerations, that

19   the "success is due to the features that are at issue in this case, as indicated in [the] infringement

20   report."  Gomez Validity Rpt. ¶ 169.  Mr. Gomez then concludes that "[t]here is a clear nexus

21   between the accused features and the technology claimed in the asserted patents."  *Id.*

22        First, as noted above, a conclusory statement such as that made by Mr. Gomez here cannot

23   raise genuine issues of fact and defeat summary judgment.  *See Thornhill*, 594 F.2d at 738.

24   Second, Mr. Gomez's theory of a nexus between the accused features and the claimed invention is

25   inconsistent with Federal Circuit case law.  Rather, the Federal Circuit requires that there be a

26   "nexus between the merits of the claimed invention and [the commercial success as] evidence of

27   secondary considerations."  *Muniauction*, 532 F.3d at 1327 (citation omitted).  Moreover,

28   commercial success may presumptively be attributed to the patented invention only where "the

United States District Court
Northern District of California

United States District Court
Northern District of California

1   marketed product embodies the claimed features, and is coextensive with them." *Id.* at 1328

2   (citation and internal quotations omitted).  VIA has not provided any evidence demonstrating that

3   all of the features in the accused products are coextensive with the asserted claims.  In fact, ASUS

4   has shown that there are numerous non-USB 3.0 related features on the accused products, a

5   showing not countered by VIA.  ASUS Reply 7.  Accordingly, the Court finds that VIA's

6   argument and Mr. Gomez's opinion on secondary considerations fail to raise a disputed issue of

7   material fact to overcome ASUS' prima facie evidence of obviousness.

8          In accordance with the analysis and undisputed facts set forth above for each of the

9   *Graham* factors, VIA has failed to raise any triable issue of material fact based on ASUS's clear

10   and convincing evidence that the asserted claims are obvious over Pilling in view of the USB 3.0

11   specification.  The Court thus determines that the asserted claims of the '747 patent are invalid for

12   obviousness.

13              **ii.    Timeliness of VIA's Trade Secret Claims**

14          ASUS contends that VIA's trade secret claims brought in 2014 are untimely as VIA was

15   aware of the USB 3.0 products that ASM was making and selling in 2010.  ASUS Mot. 16.

16   Further, ASUS points out that ASM published multiple public press releases and contributed to

17   several news articles regarding their development of USB 3.0 devices throughout 2009 and 2010.

18   *Id.* at 17.  ASUS also claims that, ASM filed a U.S. Patent application, that was later published on

19   March 25, 2010, involving a phase locked loop module having the same hierarchy of PLL

20   components that VIA claims as part of its analog schematic trade secrets.  *Id.* at 18; Ex. 8 to

21   Bhakar Decl. ("Wu Publ."), ECF 219-9.  Lastly, ASUS argues that VIA's admissions in the

22   complaint in this action as well as those made in the Complaint to the Taiwanese Criminal Court

23   in 2012 show that VIA was on inquiry notice by 2010.  ASUS Mot. 19-21.

24          VIA opposes ASUS' contention, arguing that only in November 2011 when ASM

25   published its finances showing a surge of sales of USB 3.0-related products, did it realize that it

26   was losing sales to ASUS.  VIA Opp'n 3-4.  VIA further claims that there is more than one way to

27   design chips to implement the USB 3.0 standard, and that ASM protects its own schematics and

28   source code as trade secrets, so substantial time for testing and investigation was necessary to

confirm its suspicion.  *Id.* at 4.  As to the Wu Publication, VIA points out that ASUS never produced this document in discovery in support of their defense that the trade secret claims are time-barred.  *Id.* at 5-6.  VIA also contends that the Wu Publication does not disclose its trade secrets.  *Id.* at 6.

Claims under the California Uniform Trade Secret Act ("CUTSA") and the Defend Trade Secret Act ("DTSA") "may not be commenced later than 3 years after the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered."  18 U.S.C. § 1836(d); *see* Cal. Civ. Code § 3426.6.  Generally, a plaintiff must bring a cause of action within the applicable limitations period.  *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005); *Gabelli v. S.E.C.*, 133 S. Ct. 1216 (2013) (noting that "discovery rule" delays accrual of a cause of action until the plaintiff has "discovered" it and is "an exception to the general limitations rule" that a cause of action accrues once a plaintiff has a complete and present cause of action).

As an exception to the general rule, the discovery rule "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action."  *Fox*, 35 Cal. 4th at 807.  "A plaintiff has reason to discover a cause of action when he or she 'has reason at least to suspect a factual basis for its elements.'"  *Id.* (citing *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397-98 (1999)).  Under the discovery rule, accrual of a cause of action is delayed only "until the plaintiff has, or should have, inquiry notice of the cause of action."  *Id.*  Where the discovery rule applies, the statute of limitations for the cause of action is "tolled until such time as a reasonable investigation would have revealed its factual basis."  *Id.* at 803.

Several disputed facts preclude this Court from granting summary judgment on this issue. First, the press releases and VIA's statements in the initial complaint fail to definitively show that VIA was on inquiry notice earlier than 2011.  For example, ASUS' press releases made general references to "USB 3.0" but provided no information suggesting that ASUS was likely using VIA's trade secrets, such as its code and schematics.  *E.g.*, Ex. R to Lemieux Decl. (Chen Dep. Tr.) ("I have seen information related to their products either in the press releases or in the product releases").  There are many ways to implement the USB 3.0 standard and a competitor making

1    products having a USB 3.0 connectivity does not automatically subject VIA to an inquiry notice

2    that the competitor is implementing the standard using the exact same schematics and code.

3    VIA's statements in the initial complaint also fail to establish that there is no triable issues of

4    material fact.  Viewed in a light most favorable to VIA, the complaint merely recites allegations in

5    support of their trade secret claims.  Statements such as "highly suspicious" or "could only be

6    accomplished through its reliance on proprietary technical and operational information

7    misappropriated from VIA" could be viewed as hindsight statements after having the benefit of a

8    pre-suit investigation on VIA's trade secret claims.  *See, e.g.*, *In re Lithium Ion Batteries Antitrust*

9    *Litig.*, No. 13-2420-YGR, 2014 WL 309192, at \*16 (N.D. Cal. Jan. 21, 2014) (finding the claims

10   are not time-barred and noting that the fact the complaints marshalled and characterized abstruse

11   economic data and market characteristics information that were matters of public record at the

12   time of the asserted conspiracy did not mean conspiracy was or should have been "obvious" to

13   plaintiffs and caused them to investigate).

14          ASUS further claims that ASM's patent application, the Wu Publication, should have

15   provided inquiry notice to VIA because the subject matter in the Wu Publication involves a phase

16   locked loop module having the same hierarchy of phase locked loop components that VIA claims

17   as part of its analog schematic trade secrets.  ASUS also argues that the Wu Publication was not

18   provided during discovery because it was not aware that VIA's trade secret claims encompass

19   hierarchical arrangement of VIA's analog schematics until Mr. Gomez disclosed his expert report

20   on December 17, 2016.  ASUS Reply 13-14.  With respect to the Wu Publication, the Court will

21   exclude it from consideration as untimely under Fed. R. Civ. P. 37(c)(1).  VIA provided evidence

22   at the hearing that its trade secret disclosures prior to December 17, 2016, adequately disclosed

23   that VIA's trade secrets claims include not just the individual schematics but their interrelatedness

24   and the overall hierarchy.  ASUS has not adequately countered VIA's showing so the Court finds

25   that its failure to provide the Wu Publication as part of its Rule 26 disclosures was not

26   substantially justified under Rule 37.  Even if the Court were to consider the Wu Publication on

27   this motion, ASUS has failed to meet its burden in showing that the Wu Publication discloses

28   VIA's trade secrets at issue in this case or how it would alert VIA that ASUS' products were

United States District Court
Northern District of California

implementing VIA's trade secrets.  Gomez Decl. ¶¶ 11-13, ECF 232 (stating that the Wu publication "describes, at a very high level, a programmable [phase locked loop]," which has been used in integrated circuits chips since the 1960's).  Thus, the Court concludes that there are disputed issues of fact precluding summary judgment on this issue.

## VI.    ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

VIA's motion for partial summary judgment that ASUS infringes claims 1, 7, 12, and 15 of the '747 patent is GRANTED;

VIA's motion for partial summary judgment that claims 13, 14, and 18 of the '187 patent are not anticipated or rendered obvious based on the Fielder paper and the Lin Reference is DENIED;

VIA's motion for partial summary judgment that claims 13, 14, and 18 of the '187 patent are not anticipated or rendered obvious over TLK2500 Datasheet is GRANTED;

VIA's motion for partial summary judgment that certain references and devices do not anticipate or render obvious claims 1, 7, 12, and 15 of the '747 patent is MOOT.

ASUS' motion for partial summary judgment that the asserted claims 1, 7, 12, and 15 of the '747 patent are obvious over U.S. Patent Publ. 2010/0032818 ("Pilling") in view of USB 3.0 specification revision 1.0 is GRANTED;

ASUS' motion for partial summary judgment that VIA's trade secret claims are time barred is DENIED.

Dated: April 27, 2017

_____
BETH LABSON FREEMAN
United States District Judge